(152 P.3d 678)
No. 95,353

STATE OF KANSAS, *Appellee,* v. JACKIE R. POULTON, *Appellant.*

300

*Shawn Minihan*, of Kansas Appellate Defender Office, for appellant.

*Thomas R. Stanton*, deputy district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREEN, P.J., MARQUARDT, J., and BRAZIL, S.J.

GREEN, J.: Jackie Poulton appeals his convictions and sentences on 14 counts of drug-related crimes and 1 count of child endangerment. These convictions stem from evidence obtained during two searches of Poulton's home, the first occurring in November 2003 and the second occurring during December 2003. First, Poulton argues that the trial court erred in denying Poulton's motion to suppress the evidence obtained during the November 2003 search. We agree. Based on the trial court's findings, the law enforcement officers never gained lawful entry into Poulton's home. Moreover, once the officers gained entry to the home, they exceeded the scope of Poulton's consent to search his home. As a result, any evidence obtained during the November 2003 search should have been suppressed as fruit of the poisonous tree.

Poulton also argues that the trial court should have suppressed the evidence obtained during the December 2003 search as fruit of the poisonous tree. Nevertheless, because Poulton failed to properly raise this issue before the trial court, we decline to address his argument. Finally, Poulton contends that the trial court erred in ordering reimbursement of fees to the Board of Indigents' Defense Services (BIDS) without considering his financial situation. We agree. *State v. Robinson*, 281 Kan. 538, Syl. ¶ 1, 132 P.3d 934

(2006), requires the sentencing court to consider on the record at the time of assessing BIDS fees the defendant's financial resources and the burden that payment of the fees will impose. Because such consideration is absent from the record here, we remand for the trial court to comply with *Robinson* in assessing BIDS fees. Accordingly, we affirm in part, reverse in part, and remand for re-sentencing.

On November 20, 2003, Ed Mora, a special enforcement officer with the Kansas Department of Corrections, was seeking to serve an arrest warrant on Lisa Lamuz for violating her parole. Mora had been attempting to locate Lamuz for approximately 3 weeks. Deputy Cory Graber told Mora that Lamuz might be staying at a residence at 6112 North Plum in Hutchinson. Mora, Graber, and Deputy Jeremy Hedges went to that address to attempt to serve the arrest warrant on Lamuz.

Upon arriving at the residence, Graber went to the back of the residence, and Mora and Hedges walked towards the front door. Poulton came out of the house and met the officers on the porch. Mora told Poulton who he was. According to Mora, he asked Poulton if he could speak with him inside, and Poulton responded, "[Y]es, come on in." Hedges' testimony differed from Mora's in that Hedges never testified that Poulton explicitly consented to them entering the residence. Rather, Hedges testified that Mora asked if he could speak with Poulton and that Poulton responded yes and opened the door and let them in the house.

According to Mora, once they were inside the residence, he asked Poulton if Lamuz was there. Poulton told Mora that Lamuz was in the back room and that he would go get her. Mora testified that Poulton walked towards the kitchen area of the residence, but he touched Poulton on the arm to stop him. Mora told Poulton that he would get Lamuz. As Mora walked towards the kitchen area, Lamuz walked out of a back room. Mora told Lamuz who he was and that she was under arrest. Mora led her into the front room and attempted to place handcuffs on her. Lamuz told Mora that she was not on parole anymore and that he had made a mistake. Lamuz indicated that she had paperwork showing that she was no longer on parole. Lamuz tried to turn away from Mora, but

he forcefully grabbed her and placed her in handcuffs. Approximately five other individuals were in the residence when this incident occurred.

As Mora was attempting to handcuff Lamuz, Hedges saw Lamuz raise her hand. Hedges immediately called Graber into the residence. Graber entered through the back door as two individuals were attempting to leave the residence. Graber stopped them from leaving. One of the individuals and Poulton went into a back bedroom. Graber saw several rifles and shotguns lying against the doorway. Graber yelled to the other officers that he had seen guns. Graber ordered everyone out of the back bedroom.

According to Graber, Poulton said that he needed to get Lamuz' shoes out of the bedroom and that Graber could accompany him in there. When Graber went into the back bedroom, he saw a handgun lying on the bed. In addition, Graber saw a test tube containing what appeared to be methamphetamine residue, a razor blade with white powder residue, and an open package of lithium batteries. Graber relayed this information to Hedges who immediately applied for a search warrant.

The officers confined everyone in the house to one area and handcuffed them. In addition, the officers performed patdown searches for safety reasons. When Poulton was told about the application for a search warrant, he said that his chest was hurting and that he thought he was having a heart attack. Emergency medical services (EMS) personnel were called to the residence.

Before EMS personnel transported Poulton to the hospital, Graber performed a patdown search. Poulton was not in handcuffs at the time and was not under arrest. Graber testified that the patdown was done for EMS safety purposes. Although Poulton had been in handcuffs earlier, Graber testified that a patdown search had not been performed. During the patdown search, Graber reached for Poulton's right pocket. Poulton told Graber that he should not stick his hand in there. Graber pulled syringes out of Poulton's pocket.

A search warrant was obtained for the residence. During their search, the officers seized baggies of methamphetamine, drug par-

aphernalia, and items commonly used in manufacturing methamphetamine.

On December 27, 2003, Graber and three other officers returned to the residence to serve arrest warrants on four individuals, including Poulton. During the arrests, the officers saw a handgun on a bed in one of the bedrooms, paraphernalia used for methamphetamine, and small baggies containing a white powder that was consistent with methamphetamine. The officers obtained a search warrant for the residence. During their search, the officers seized drug paraphernalia, several baggies of methamphetamine, several baggies of green vegetation, and various items commonly used in manufacturing methamphetamine.

From the November 20, 2003, incident, Poulton was charged with eight drug-related crimes. Poulton moved to suppress the evidence obtained from the November 20, 2003, search and any statements made by him during or resulting from the search. Poulton argued that the officers never had consent to enter his residence. Poulton contended that the officers' observations, which formed the basis for the search warrant, were made while they were illegally in his residence. The trial court held an evidentiary hearing on Poulton's motion to suppress.

At the suppression hearing, Poulton testified that he never gave the officers consent to enter his residence. Rather, Poulton testified that the entire conversation concerning Lamuz happened outside of his residence and that he told the officers he would go inside and get Lamuz. Poulton testified that he asked the officers if they would wait on his front porch, but the officers told him no. The officers followed Poulton into his residence.

At the conclusion of the hearing, the trial court found that the officers had implied consent to enter Poulton's residence. The trial court recognized that there were three different versions of what had occurred at Poulton's residence based on the testimonies of Mora, Hedges, and Poulton. The trial court found that Poulton's testimony that he told the officers to stay outside the residence was not credible. The trial court found that Mora indicated that he was going to get Lamuz, that Poulton indicated that he would do it, and that they all went in the house together. The trial court deter-

mined that the officers had implied consent to enter Poulton's residence. The trial court denied Poulton's motion to suppress.

In a separate criminal case, Poulton was charged with eight additional drug-related crimes along with the crimes of contributing to a child's misconduct and endangering a child. All of these charges resulted from the December 27, 2003, incident. Poulton moved to suppress the evidence obtained from the December 27, 2003, search of his home. The trial court conducted an evidentiary hearing and denied Poulton's motion to suppress.

Upon motion by the State, the trial court later consolidated Poulton's two criminal cases. Poulton's consolidated case went to a bench trial on stipulated facts. The trial court found Poulton guilty of two counts of manufacture of methamphetamine in violation of K.S.A. 65-4159; two counts of possession of methamphetamine in violation of K.S.A. 65-4161; one count of possession of lithium metal with the intent to manufacture a controlled substance in violation of K.S.A. 65-7006; one count of possession of anhydrous ammonia or pressurized ammonia with the intent to manufacture a controlled substance in violation of K.S.A. 65-7006; five counts of felony possession of drug paraphernalia in violation of K.S.A. 65-4152(a); two counts of possession of methamphetamine without tax stamps affixed in violation of K.S.A. 79-5204; one count of possession of marijuana in violation of K.S.A. 65-4162(a)(3); and one count of endangering a child in violation of K.S.A. 21-3608. Poulton was sentenced to a controlling sentence of 30 months in prison.

*I. Should the trial court have suppressed the evidence from the November 20, 2003, search?*

First, Poulton argues that the trial court erred in denying his motion to suppress. Poulton maintains that the evidence from the November 20, 2003, search was illegally obtained because the officers never had express consent to enter his home. Poulton contends that the trial court's finding that the officers had implied consent to enter was insufficient to satisfy the constitutional requirement for voluntary consent.

*Standard of Review*

When reviewing the trial court's decision on a motion to suppress, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. An appellate court does not reweigh the evidence, determine the credibility of witnesses, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

*Search and Seizure*

The Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures, and a warrantless search is per se unreasonable unless it falls within one of the recognized exceptions. *State v. Ramirez*, 278 Kan. 402, 404-05, 100 P.3d 94 (2004). Consequently, a warrantless search of a house is per se unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). Moreover, " '[t]he Fourth Amendment protects a citizen's reasonable expectations of privacy and one's reasonable expectation of privacy in the home is entitled to unique sensitivity. [Citations omitted.]' " *State v. Reno*, 260 Kan. 117, 128, 918 P.2d 1235 (1996). Absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment to the United States Constitution. *Steagald v. United States*, 451 U.S. 204, 211, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981). Evidence recovered following an illegal entry of the home is inadmissible and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-87, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Reno*, 260 Kan. at 129.

Now we turn our attention to the issue in this case. This suppression case turns on whether the officers' initial entry into Poulton's home was lawful. In addition to the recognized exceptions of exigency and consent, which will be discussed later in this opinion, our United States Supreme Court has considered another excuse for a warrantless entry into a home. In *Payton*, the United States Supreme Court determined that a search warrant was not constitutionally required if the entry was made into a residence where a person who was the subject of a felony arrest warrant

resided when there was probable cause to believe that the person was present in the home. *State v. Thomas*, 280 Kan. 526, 531, 124 P.3d 48 (2005).

The State does not argue that the officers had probable cause to believe that Lamuz resided in the house. The trial court found that there was no evidence to indicate that Lamuz lived at the residence other than Graber's testimony that he had heard that Lamuz might be there. There is nothing in the record establishing that the officers had probable cause to believe that Lamuz resided in the house. Therefore, the officers' entry into the house does not fall within the rule in *Payton*.

An arrest warrant alone is an insufficient basis to allow entry into a third party's residence. *Thomas*, 280 Kan. at 532. Because the officers' entry into Poulton's home was based on the arrest warrant for Lamuz, the officers' warrantless search for Lamuz was unconstitutional. See *Steagald*, 451 U.S. at 215-16; *Thomas*, 280 Kan. at 533. Nevertheless, as stated earlier, consent or exigent circumstances may furnish a basis for law enforcement officers to enter a third party's home to search for the subject of an arrest warrant. See 451 U.S. at 212, and 280 Kan. at 533. The State does not argue that there were exigent circumstances justifying the officers' warrantless entry into Poulton's house. Rather, the State contends that the officers had Poulton's consent to enter the house. As a result, the State has waived any argument concerning exigent circumstances. See *State v. Hicks*, 282 Kan. 599, 618, 147 P.3d 1076 (2006) (declining to consider good faith exception to exclusionary rule when appellant failed to argue its applications).

*Consent*

Because the State relies on consent for the legality of the officers' entry and search, the State was required to prove by a preponderance of the evidence that Poulton's consent to enter his home to search for Lamuz was "voluntarily, intelligently, and knowingly" given. See *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993). Quoting *State v. Henry*, 14 Kan. App. 2d 416, 420, 792 P.2d 358, *rev. denied* 247 Kan. 706 (1990), our Supreme Court in *State v. Ninci*, 262 Kan. 21, 32, 936 P.2d 1364 (1997), stated that

a defendant's consent must be "unequivocal and specific" and "freely and intelligently given" and that the question of voluntariness should be considered under the totality of the circumstances:

> " 'To be voluntary, the defendant's consent must be "unequivocal and specific" and "freely and intelligently" given. The consent must be given without duress or coercion, express or implied. The State bears the burden of proving voluntariness. [Citations omitted.] The Kansas Supreme Court recently reiterated that the question of voluntariness should be decided in light of the totality of the circumstances, considering whether the individual was threatened or coerced and whether the individual was informed of his rights. *State v. Ruden*, 245 Kan. 95, 774 P.2d 972 (1989).' "

Here, the trial court found that the officers had implied consent to enter the residence. The trial court found that Mora indicated that he was going to get Lamuz, that Poulton indicated that he would do it, and that they all went inside the house together. The trial court noted that the officers were never told not to come inside the house. In addition, the trial court stated that the officers did not commit an illegal act by following Poulton into the residence when he indicated he would go in and get Lamuz.

Our research revealed no Kansas precedent in which our courts have held that consent to enter a house may be implied. Black's Law Dictionary 305 (6th ed. 1990) defines "implied consent" as

> "[t]hat manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption or inference that the consent has been given. An inference arising from a course or conduct or relationship between the parties, in which there is mutual acquiescence or a lack of objection under circumstances signifying assent."

Consent by implication, however, is contrary to established law. Our Supreme Court has furnished clear guidance concerning voluntary consent. The consent must be " 'unequivocal and specific' " and " 'freely and intelligently' given." See *Ninci*, 262 Kan. at 32. In order to determine that Poulton had voluntarily consented to the officer's entry into his home, the trial court needed to find that Poulton's consent was unequivocal and freely given. The fact that Poulton acquiesced or impliedly consented in the officers' entry does not meet the standard for voluntary consent. Moreover, the State does not discharge its burden to prove voluntary consent to justify the lawfulness of a search "by showing no more than ac-

quiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968).

Similarly, our Supreme Court has held that mere acquiescence to a claim of lawful authority is inadequate to show voluntary consent. *State v. Jones*, 279 Kan. 71, 78, 106 P.3d 1 (2005) (A defendant's mere acquiescence to a preliminary breath test did not establish voluntary consent.). Based on the trial court's finding that Poulton impliedly consented to the officer's entry into his home, the State failed to prove by a preponderance of the evidence that Poulton "unequivocally, specifically, freely, and intelligently consented" to the officers' entry into his home "and did not merely submit to lawful authority." 279 Kan. at 78. Accordingly, under the trial court's holding of implied consent, the evidence seized from the November 22, 2003, search should have been suppressed.

*Scope of Consent*

Nevertheless, even if the officers had consent to enter Poulton's home, Poulton never gave the officers consent to search his home for Lamuz. The scope of a warrantless search based on consent is controlled by the suspect. *Florida v. Jimeno*, 500 U.S. 248, 252, 114 L. Ed. 2d 297, 111 S. Ct. 1801 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). Poulton's consent was conditional in light of the fact that he specifically told the officers that he would get Lamuz for them. Poulton telling the officers that he would get Lamuz for them and walking toward the area of the house where Lamuz was located placed a limitation on the scope of the search to which he consented. Mora clearly exceeded the scope of Poulton's consent when he physically restrained Poulton by grabbing his arm and telling him that he would get Lamuz and then proceeded through the house.

The State contends, however, that Mora's actions were reasonable in light of the fact that there were numerous people in the house and that Poulton was going to contact a wanted parole violator. The State asserts that allowing Poulton to contact Lamuz with the information that a parole officer had come to arrest her "may

very well have resulted in an attempt to attack the officer or to escape, placing the officer at risk." Nevertheless, the State provides no authority indicating that such a hypothetical situation would justify officers conducting a warrantless search of a third party's home. Moreover, if this type of action by the officers were approved, "it would create a significant potential for abuse." *State v. Thomas*, 280 Kan. at 533.

As discussed above, in order for the officers to conduct a warrantless search of Poulton's home, they needed to have Poulton's voluntary consent or they needed to show exigent circumstances. See *Thomas*, 280 Kan. at 533. Moreover, as stated earlier, the State did not argue exigent circumstances to justify the warrantless search of Poulton's home. Further, even if the State had argued exigent circumstances, the record fails to show that there were exigent circumstances that would have warranted Mora's actions. The officers did not see any guns or any evidence of criminal activity when they entered the house. Poulton had been cooperative with the officers. Poulton told the officers that Lamuz was there and that he would get her. There was no indication that Lamuz was attempting to leave Poulton's home. As a result, Mora would not have been justified in searching Poulton's home for Lamuz based on exigent circumstances.

The State, however, suggests that Graber's presence in the house was lawful because he had been called in for safety reasons. Nevertheless, Graber's discovery of the contraband occurred only after Mora and Hedges had illegally entered Poulton's residence, or at the very least, after Mora had exceeded the scope of the search to which Poulton had consented. "It is, of course an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990).

In *Reno*, our Supreme Court held that sheriff deputies' entry into a defendant's home was unlawful and determined that the deputies' unlawful entry rendered their plain view of contraband irrelevant: "Where law enforcement officers are prompted to seek

a search warrant based on their observations made during an unlawful entry, and those observations are presented to a magistrate to obtain a search warrant, evidence seized as a result of the execution of that search warrant is not admissible." 260 Kan. 117, Syl. ¶ 1. Here, the officers' intrusion into Poulton's home was unlawful. Like *Reno*, the plain view exception is inapplicable here because Graber's plain view of the items occurred in a place where he had no legitimate right to be.

One more thing is worth noting about the *Reno* decision. In considering the high expectation of privacy in a person's home, the *Reno* court stated that it would apply "a heightened standard for reasonableness when entry into a suspect's residence is involved." 260 Kan. at 128. Here, Poulton neither was a suspect nor was he under arrest when the officers entered his home. Absent these facts, consent, and exigent circumstances, the officers' entry into Poulton's home failed to meet the heightened standard of reasonableness test to justify their warrantless search of Poulton's home and bedroom.

Based on the evidence in the record and the trial court's findings, Poulton placed a limitation on the scope of the search to which he consented. Because Mora exceeded the scope of Poulton's consent, the search was invalid. "Moreover, the exclusionary rule prohibits the admission of the 'fruits' of illegally seized evidence, *i.e.*, any information, object, or testimony uncovered or obtained, directly or indirectly, as a result of the illegally seized evidence or any leads obtained therefrom." *State v. Jones*, 279 Kan. at 76 (citing *State v. Horn*, 278 Kan. 24, 31, 91 P.3d 517 [2004]). The evidence obtained from the November 20, 2003, search of Poulton's house should have been suppressed.

## II. Should the trial court have suppressed the evidence from the December 27, 2003, search?

In addition, Poulton suggests that the evidence obtained during the December 27, 2003, arrest should have been suppressed as fruit of the poisonous tree. Poulton contends that had the illegal entry into his home on November 27, 2003, not occurred, the December 2003 arrest warrants would not have been issued.

Nevertheless, Poulton never raised this issue with the trial court when he moved to suppress the evidence obtained from the December 27, 2003, search of his home. Generally, issues not raised before the trial court cannot be raised on appeal. *State v. Rojas,* 280 Kan. 931, 932, 127 P.3d 247 (2006). There are several exceptions to the rule that a new legal theory may not be asserted for the first time on appeal. See *State v. Schroeder,* 279 Kan. 104, 116, 105 P.3d 1237 (2005). Nevertheless, Poulton fails to make any argument that his newly raised issue fits within one of these exceptions.

*III. Should the trial court have considered Poulton's financial resources on the record before assessing BIDS fees?*

Finally, Poulton contends that the trial court erred in ordering him to reimburse the Board of Indigents' Defense Services (BIDS) for attorney fees without considering his ability to pay, the financial burden that payment would impose, and the validity of the fees.

This issue is controlled by *State v. Robinson,* 281 Kan. 538, Syl. ¶ 1, 132 P.3d 934 (2006), where our Supreme Court held: "A sentencing court assessing fees to reimburse the Board of Indigents' Defense Services under K.S.A. 2005 Supp. 22-4513 must consider on the record at the time of assessment the financial resources of the defendant and the nature of the burden that payment of the fees will impose." Here, at the time of assessing BIDS fees to Poulton, the trial court failed to consider on the record Poulton's financial resources and the nature of the burden that payment of the BIDS would impose. Under *Robinson,* this case should be remanded for resentencing with directions for the trial court to comply with K.S.A. 2006 Supp. 22-4513 concerning the assessment of BIDS fees.

In summary, we reverse the convictions resulting from the November 20, 2003, search; affirm the convictions resulting from the December 27, 2003, search; and remand for the trial court to comply with *Robinson* concerning the assessment of BIDS fees.

Affirmed in part, reversed in part, and remanded with directions.