No. 95,353

STATE OF KANSAS, *Appellee*, v. JACKIE R. POULTON, *Appellant*.
(179 P.3d 1145)

Opinion filed April 4, 2008.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for the appellant.

*Thomas R. Stanton*, deputy district attorney, argued the cause, and *Keith E. Schroeder*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Jackie R. Poulton was convicted of manufacturing methamphetamine, possessing methamphetamine with intent to sell, possessing drug paraphernalia with intent to manufacture, possessing drug paraphernalia with intent to distribute, possessing

drug paraphernalia with intent to consume, possessing marijuana, possessing drugs without a tax stamp, and endangering a child.

Prior to trial, Poulton filed motions to suppress the evidence obtained from two searches of his home, both of which the district court denied. The Court of Appeals reversed the convictions based on the November 20, 2003, search, finding that the search was illegal, but affirmed the convictions based on the December 27, 2003, search without addressing Poulton's suppression issue that the second search constituted fruit of the poisonous tree. *State v. Poulton*, 37 Kan. App. 2d 299, 152 P.3d 678 (2007). We granted Poulton's petition for review, and we now affirm in part and reverse in part the decision of the Court of Appeals.

The relevant facts, as stated by the Court of Appeals, follow:

"On November 20, 2003, Ed Mora, a special enforcement officer with the Kansas Department of Corrections, was seeking to serve an arrest warrant on Lisa Lamuz for violating her parole. Mora had been attempting to locate Lamuz for approximately 3 weeks. Deputy Cory Graber told Mora that Lamuz might be staying at a residence at 6112 North Plum in Hutchinson. Mora, Graber, and Deputy Jeremy Hedges went to that address to attempt to serve the arrest warrant on Lamuz.

"Upon arriving at the residence, Graber went to the back of the residence, and Mora and Hedges walked towards the front door. Poulton came out of the house and met the officers on the porch. Mora told Poulton who he was. According to Mora, he asked Poulton if he could speak with him inside, and Poulton responded, '[Y]es, come on in.' Hedges' testimony differed from Mora's in that Hedges never testified that Poulton explicitly consented to them entering the residence. Rather, Hedges testified that Mora asked if he could speak with Poulton and that Poulton responded yes and opened the door and let them in the house.

"According to Mora, once they were inside the residence, he asked Poulton if Lamuz was there. Poulton told Mora that Lamuz was in the back room and that he would go get her. Mora testified that Poulton walked towards the kitchen area of the residence, but he touched Poulton on the arm to stop him. Mora told Poulton that he would get Lamuz. As Mora walked towards the kitchen area, Lamuz walked out of a back room. Mora told Lamuz who he was and that she was under arrest. Mora led her into the front room and attempted to place hand-cuffs on her. Lamuz told Mora that she was not on parole anymore and that he had made a mistake. Lamuz indicated that she had paperwork showing that she was no longer on parole. Lamuz tried to turn away from Mora, but he forcefully grabbed her and placed her in handcuffs. Approximately five other individuals were in the residence when this incident occurred.

"As Mora was attempting to handcuff Lamuz, Hedges saw Lamuz raise her hand. Hedges immediately called Graber into the residence. Graber entered through the back door as two individuals were attempting to leave the residence. Graber stopped them from leaving. One of the individuals and Poulton went into a back bedroom. Graber saw several rifles and shotguns lying against the doorway. Graber yelled to the other officers that he had seen guns. Graber ordered everyone out of the back bedroom.

"According to Graber, Poulton said that he needed to get Lamuz' shoes out of the bedroom and that Graber could accompany him in there. When Graber went into the back bedroom, he saw a handgun lying on the bed. In addition, Graber saw a test tube containing what appeared to be methamphetamine residue, a razor blade with white powder residue, and an open package of lithium batteries. Graber relayed this information to Hedges who immediately applied for a search warrant.

"The officers confined everyone in the house to one area and handcuffed them. In addition, the officers performed patdown searches for safety reasons. When Poulton was told about the application for a search warrant, he said that his chest was hurting and that he thought he was having a heart attack. Emergency medical services (EMS) personnel were called to the residence.

"Before EMS personnel transported Poulton to the hospital, Graber performed a patdown search. Poulton was not in handcuffs at the time and was not under arrest. Graber testified that the patdown was done for EMS safety purposes. Although Poulton had been in handcuffs earlier, Graber testified that a patdown search had not been performed. During the patdown search, Graber reached for Poulton's right pocket. Poulton told Graber that he should not stick his hand in there. Graber pulled syringes out of Poulton's pocket.

"A search warrant was obtained for the residence. During their search, the officers seized baggies of methamphetamine, drug paraphernalia, and items commonly used in manufacturing methamphetamine.

"On December 27, 2003, Graber and three other officers returned to the residence to serve arrest warrants on four individuals, including Poulton. During the arrests, the officers saw a handgun on a bed in one of the bedrooms, paraphernalia used for methamphetamine, and small baggies containing a white powder that was consistent with methamphetamine. The officers obtained a search warrant for the residence. During their search, the officers seized drug paraphernalia, several baggies of methamphetamine, several baggies of green vegetation, and various items commonly used in manufacturing methamphetamine.

"From the November 20, 2003, incident, Poulton was charged with eight drug-related crimes. Poulton moved to suppress the evidence obtained from the November 20, 2003, search and any statements made by him during or resulting from the search. Poulton argued that the officers never had consent to enter his residence. Poulton contended that the officers' observations, which formed the basis for the search warrant, were made while they were illegally in his residence. The trial court held an evidentiary hearing on Poulton's motion to suppress.

"At the suppression hearing, Poulton testified that he never gave the officers consent to enter his residence. Rather, Poulton testified that the entire conversation concerning Lamuz happened outside of his residence and that he told the officers he would go inside and get Lamuz. Poulton testified that he asked the officers if they would wait on his front porch, but the officers told him no. The officers followed Poulton into his residence.

"At the conclusion of the hearing, the trial court found that the officers had implied consent to enter Poulton's residence. The trial court recognized that there were three different versions of what had occurred at Poulton's residence based on the testimonies of Mora, Hedges, and Poulton. The trial court found that Poulton's testimony that he told the officers to stay outside the residence was not credible. The trial court found that Mora indicated that he was going to get Lamuz, that Poulton indicated that he would do it, and that they all went in the house together. The trial court determined that the officers had implied consent to enter Poulton's residence. The trial court denied Poulton's motion to suppress.

"In a separate criminal case, Poulton was charged with eight additional drug-related crimes along with the crimes of contributing to a child's misconduct and endangering a child. All of these charges resulted from the December 27, 2003, incident. Poulton moved to suppress the evidence obtained from the December 27, 2003, search of his home. The trial court conducted an evidentiary hearing and denied Poulton's motion to suppress.

"Upon motion by the State, the trial court later consolidated Poulton's two criminal cases. Poulton's consolidated case went to a bench trial on stipulated facts. The trial court found Poulton guilty of two counts of manufacture of methamphetamine in violation of K.S.A. 65-4159; two counts of possession of methamphetamine in violation of K.S.A. 65-4161; one count of possession of lithium metal with the intent to manufacture a controlled substance in violation of K.S.A. 65-7006; one count of possession of anhydrous ammonia or pressurized ammonia with the intent to manufacture a controlled substance in violation of K.S.A. 65-7006; five counts of felony possession of drug paraphernalia in violation of K.S.A. 65-4152(a); two counts of possession of methamphetamine without tax stamps affixed in violation of K.S.A. 79-5204; one count of possession of marijuana in violation of K.S.A. 65-4162(a)(3); and one count of endangering a child in violation of K.S.A. 21-3608. Poulton was sentenced to a controlling sentence of 30 months in prison." 37 Kan. App. 2d at 301-04.

The Court of Appeals found, and at oral argument on review the State conceded, that the initial search conducted on November 20, 2003, was illegal. See 37 Kan. App. 2d at 308, 310. We agree and affirm the decision of the Court of Appeals reversing the convictions based on the initial search. The issue relating to the imposition of the Board of Indigents' Defense Services (BIDS) fees is not before us on review, and the decision of the Court of Appeals

reversing and remanding the assessment of the BIDS fees to comply with *State v. Robinson*, 281 Kan. 538, Syl. ¶ 1, 132 P.3d 934 (2006), must stand since it was not appealed.

The Court of Appeals affirmed Poulton's convictions based on the December 27, 2003, search. The Court of Appeals elected not to address Poulton's claim that the evidence seized during the December 27, 2003, search was the fruit of the poisonous tree because Poulton failed to raise the issue in the district court and failed to argue that any exceptional circumstances applied, thereby failing to preserve the issue for appeal. 37 Kan. App. 2d at 310-11.

Appellate courts can consider new issues on appeal in the following circumstances: (1) Cases in which the newly asserted theory involves only a question of law arising on proved or admitted facts and that is finally determinative of the case; (2) cases raising questions for the first time on appeal if consideration of those questions is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) cases upholding the judgment of a trial court even though the trial court may have relied on the wrong ground or assigned a wrong reason for its decision. *State v. Stevens*, 278 Kan. 441, 454, 101 P.3d 1190 (2004) (citing *State v. Bell*, 258 Kan. 123, 126, 899 P.2d 1000 [1995]).

At least one of the first two exceptions applies in the present case. Poulton and the State entered into a written stipulation of facts for the bench trial. The written stipulation specifically renewed Poulton's objection to the denial of his motions to suppress and preserved the issue of suppression for appeal. Because there are no factual disputes, the question of whether the evidence stemming from the second search should have been suppressed is a purely legal question. The first exception may apply if it is determined that the evidence should have been suppressed and the suppression finally disposes of the case. The second exception applies because the suppression of evidence based on the violation of Poulton's rights under the Fourth Amendment to the United States Constitution implicates a fundamental right.

The fruit of the poisonous tree doctrine bars the admission of evidence directly seized during an illegal search as well as evidence obtained indirectly as a result of information learned or leads ob-

tained from the illegal search. Although not all evidence is fruit of the poisonous tree simply because it would not have become known without the illegal actions of the police, the doctrine bars any evidence that becomes known through exploitation of the illegality. Evidence that is sufficiently distinguishable so as to be purged of the primary taint is not considered fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Hodges*, 252 Kan. 989, 1006, 851 P.2d 352 (1993); *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975).

Although the parties stipulated to the facts leading to the convictions, the State did not have the opportunity to analyze the facts in light of the fruit of the poisonous tree doctrine. The district court found that the initial search was valid, and Poulton did not argue that the second search and arrest constituted fruit of the poisonous tree. Because the parties have not had a full opportunity to argue this issue in light of the conclusion that the first search was illegal, we decline to find that the doctrine of the fruit of the poisonous tree necessarily applies to the facts of this case. We instead vacate the convictions based on the December 27, 2003, search and remand the case to the district court for the purpose of conducting a hearing to determine whether the evidence based on that search should be suppressed as fruit of the poisonous tree. Any appeal taken from that hearing will be docketed as an original appeal in the Court of Appeals.

Judgment of the Court of Appeals is affirmed in part and reversed in part. Judgment of the district court is reversed, and the case is remanded with directions to the district court.