NOT DESIGNATED FOR PUBLICATION

No. 117,937

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRANDON LEE HARDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed October 19, 2018. Reversed and remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., PIERRON and BUSER, JJ.

PER CURIAM:  Brandon Lee Harder was convicted in a nonjury trial of possession of methamphetamine and possession of drug paraphernalia. Under the United States Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), "law enforcement officers may stop and frisk a person in a public place if the officers reasonably suspect (1) [that] criminal activity may be afoot and (2) [that] the person being investigated is armed and presently dangerous." *State v. Bannon*, 306 Kan. 886, 892, 398 P.3d 846 (2017). After conducting a *Terry* stop and frisk, police officers found a methamphetamine pipe on Harder. Harder moved to suppress the evidence,

1

arguing that the stop and frisk was unlawful. The trial court denied the motion, holding that the officers had reasonable suspicion to conduct the stop and frisk. Alternatively, the trial court held that Harder consented to the frisk. Harder appealed. Substantial competent evidence supports the trial court's holding that the officers had reasonable suspicion to stop Harder. The evidence, however, does not support the trial court's holding that the officers had reasonable suspicion to frisk Harder. Moreover, the evidence does not support the trial court's holding that Harder freely and intelligently consented to the frisk. As a result, we reverse Harper's convictions and remand with directions to suppress the evidence discovered during the illegal search.

Officer Aaron Carswell was on patrol in Salina one morning when he saw a man standing behind some bushes near a house at the intersection of Crawford and Wood Streets. The bushes were only about a foot from the house. The man was not looking into the house or peering into windows. Nevertheless, as Officer Carswell pulled onto Wood Street, the man "took off running along the side of the house back towards the west." Officer Carswell left his car and attempted to make contact with the man. But the man ran through the back yard of the house and onto Fourth Street, which is west of Wood Street. A person south of the house told Officer Carswell that he did not recognize the man as a resident of the house. Officer Carswell called for another officer to assist him because he did not know if he would be able to catch up with the man.

Officer Kyle Jacobs responded to Officer Carswell's call for assistance. When he arrived in the vicinity, he saw the man walking toward Fifth Street. The man turned around when he saw Officer Jacobs and returned toward Fourth Street. Officer Jacobs parked his vehicle on Fourth Street with his lights flashing. The man turned around again. At that point, Officer Jacobs asked the man if he could talk to him. The man identified himself as Brandon Lee Harder.

Officer Jacobs thought Harder looked rigid. Officer Jacobs testified that he asked if he could pat Harder down and that he believed Harder consented. Officer Jacobs explained that he customarily asks suspicious persons if he can pat them down to see if they have any weapons. Nevertheless, Officer Jacobs did not immediately pat Harder down. He testified that when he sees rigid muscle tension it could be a sign of aggression, and he did not want to put himself in a dangerous situation. He waited a couple of minutes for Officer Carswell to arrive. During that time, Harder told Officer Jacobs that he had been involved in an argument and that he was headed to his uncle's house on Fifth Street. Officer Jacobs thought that was odd because Harder was headed toward Fifth Street when he first saw him. But Harder had turned around and headed back toward Fourth Street.

When Officer Carswell arrived, he thought Harder looked like he was having a hard time standing still. Harder was constantly moving his fingers and toes, and he appeared to be fidgety and extremely nervous. Officer Carswell asked Harder if he could pat him down to check for weapons. He testified that he asked Harder, "Do you mind if I check to make sure you don't have any weapons," and that Harder replied either "no, or okay." Harder denied consenting to the patdown.

During the patdown, Officer Carswell felt an object in the pocket of Harder's shorts. He thought it may have been a pocketknife or a pipe, but he was not sure. He asked Harder what the object was and Harder said it was headphones. This did not sound accurate to Officer Carswell. Officer Carswell pulled the item out of Harder's pocket and discovered that it was a methamphetamine pipe. Officer Jacobs recorded the encounter on his body camera. It captured the time from Officer Jacobs' stop of Harder to Harder's arrest.

The State charged Harder with unlawful possession of a controlled substance, methamphetamine, and possession of drug paraphernalia. Harder moved to suppress all

3

evidence derived from his detention. He argued that neither the stop nor the patdown was justified by reasonable suspicion. The trial court denied the motion. The trial court found Harder guilty of both charges following a bench trial on stipulated facts. The trial court sentenced Harder to 12 months of probation with an underlying prison term of 15 months and a concurrent underlying jail term of 12 months.

*Did the Trial Court Err in Denying the Motion to Suppress?*

Harder argues that the trial court erred in denying his motion to suppress because the officers did not have reasonable suspicion to justify either the stop or the frisk of his person.

An appellate court uses a bifurcated standard in reviewing a trial court's decision on a motion to suppress. The appellate court reviews the trial court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. The ultimate legal conclusion is reviewed using a de novo standard. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

The focus of this case is a *Terry* stop and frisk, named after the United States Supreme Court decision in *Terry v. Ohio*. "Under *Terry*, law enforcement officers may stop and frisk a person in a public place if the officers reasonably suspect (1) criminal activity may be afoot and (2) the person being investigated is armed and presently dangerous." *Bannon*, 306 Kan. at 892 (citing *Terry*, 392 U.S. at 30).

Terry *Stop*

Here, the trial court held that Officer Carswell had reasonable suspicion to detain Harder based on his unusual behavior. Harder was standing in close proximity to a house,

4

ran away through private property when he saw the police, and had a nervous demeanor. The trial court stated that Harder's "behavior . . . was so startling to cause a neighbor to exit his home and ask law enforcement essentially what was going on, why was there someone running through private property, someone that that person didn't recognize." The trial court thought that the facts known to the officer were sufficient to raise concerns regarding trespass, burglary, or peeping Tom behavior.

Harder challenges one of the trial court's factual findings—that his behavior was so suspicious it caused a neighbor to come out of his house and ask Officer Carswell what was happening. This particular factual finding by the trial court was not supported by substantial competent evidence. Officer Carswell merely testified that he "had spoken to a neighbor just to the south of the house and he said he didn't recognize [Harder] as a resident of the house where he was standing next to." Nowhere does the testimony show that the neighbor was prompted to come out of his house to question Officer Carswell.

Nevertheless, even without that particular factual finding, the evidence is sufficient to support the trial court's legal conclusion. The United States Supreme Court has held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). For example, in *Wardlow*, the Supreme Court held that police had reasonable suspicion to detain William Wardlow because he "fled upon seeing police officers patrolling an area known for heavy narcotics trafficking." 528 U.S. at 121. Here, Harder was not in an area known for heavy narcotics trafficking, but he was suspiciously close to a house and running through private property. His suspicious behavior, coupled with his flight from the police, provided sufficient reasonable suspicion for the officers to detain him.

Harder also argues that the police did not have reasonable suspicion of specific crimes, namely trespass or burglary. Nevertheless, *Terry* does not require an officer to

5

have reasonable suspicion that a specific crime has been or will be committed. It only requires reasonable suspicion that "criminal activity may be afoot . . . ." *Terry*, 392 U.S. at 30. Harder does not cite any caselaw to the contrary.

Because the trial court's legal conclusion is sound and is based on substantial competent evidence, we affirm its legal conclusion that the officers had reasonable suspicion to detain Harder.

Terry *Frisk*

The trial court held that the officers had two bases for frisking Harder. First, it held that Harder consented to the frisk. Second, the trial court held that the officers had reasonable articulable suspicion to conduct a frisk, even without consent. The trial court stated that "[t]he officers have got to be able to pat someone down who is behaving so suspiciously and erratically, running through neighborhoods on private property, on lawns, who are exhibiting signs of aggression through tense muscles, repeated hand gestures, shaking, nervousness, disjointed responses . . . ." We will examine each bases for the frisk, starting with whether the officers had a reasonable belief that the frisk was necessary.

While the governmental interest justifying *Terry* stops is investigating crime, the justification for *Terry* frisks is "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23. Thus, during a *Terry* stop, "if the officer reasonably suspects the person detained is armed and dangerous, the officer may perform a pat-down search, *i.e.*, frisk, of the person's outer clothing for weapons." *State v. Dean*, 42 Kan. App. 2d 558, 562, 214 P.3d 1190 (2009). "The question under *Terry*'s second prong is objective:  whether an officer would reasonably suspect that the person stopped is armed and presently dangerous." *Bannon*,

306 Kan. at 897. "[A]n officer's subjective fear or belief that a stopped person is armed and presently dangerous is not individually controlling on the question of reasonableness of a frisk." 306 Kan. at 897.

The evidence in this case does not provide a basis for a lawful *Terry* frisk. Neither Officer Jacobs nor Officer Carswell testified that they believed Harder was armed. Officer Jacobs testified that he customarily asks suspicious persons if he can pat them down to see if they have any weapons. He also testified that Harder's muscles looked flexed and rigid and that this was potentially a sign of aggression. At most, Officer Jacobs' testimony showed that he believed Harder was dangerous. But it does not provide any support for the proposition that Harder was armed. Similarly, Officer Carswell's testimony was that before the search, Harder "appeared to be extremely nervous." Moreover, Officer Carswell never articulated any reasons why he believed that Harder would be armed.

As a result, the officers failed to articulate facts that could lead to a reasonable belief that Harder was armed and dangerous. Thus, we determine that the trial court's legal conclusion that the frisk was justified under *Terry* lacked substantial competent evidence in the record.

*Consent*

Even though the frisk was not justified under *Terry*, the trial court also held that Harder consented twice to a patdown search. First, the trial court held that Harder "knowingly, voluntarily, and freely agreed to the pat down by Officer Jacobs . . . ." Second, the trial court held that Harder consented to Officer Carswell's request for a patdown. The trial court stated: "[Harder] did not disagree or refuse consent. In fact, he agreed to the pat down, and Officer Carswell then conducted the pat down of his pocket."

7

Officer Jacobs recorded his encounter with Harder on his body camera. Almost immediately upon making contact with Harder, Officer Jacobs states: "I'm going to pat you down real quick." Harder replies: "I got like [unintelligible] stuff on me. I got like headphones . . . ." At that point, Officer Jacobs interrupts him and tells him not to reach towards his pockets. The video contradicts Officer Jacobs' testimony that he asked to search Harder. It shows that Officer Jacobs told Harder that he was planning to search him. Officer Jacobs never asked for permission to search. The video also contradicts Officer Jacobs' testimony that Harder said that Officer Jacobs could pat him down. When Officer Jacobs told Harder that he intended to pat him down, Harder started describing what he had in his pockets.

The video also contradicts Officer Carswell's description of events. In the video, Officer Carswell asked Harder when he last used methamphetamine. Harder replied that it had been weeks. Officer Carswell then stated: "Weeks. You don't have anything on you now? Harder answered, "No." Officer Carswell then asked, "You mind if I check real quick?" Harder did not make an audible response. Officer Carswell moved toward Harder and asked, "Do you have any weapons with you or anything?" Harder stated: "I don't have any weapons on me." Officer Carswell then began the search. These facts do not match with Officer Carswell's testimony that he asked Harder, "Do you mind if I check to make sure you don't have any weapons," and that Harder replied either "no, or okay."

"To be voluntary, the defendant's consent must be unequivocal and specific and freely and intelligently given. The consent must be given without duress or coercion, express or implied." *State v. Ninci*, 262 Kan. 21, Syl. ¶ 4, 936 P.2d 1364 (1997). Harder argues that he did not unequivocally and specifically consent, and that even if he did, his consent was not free and voluntary.

The video supports Harder's argument that he never unequivocally and specifically consented to a search. Officer Jacobs did not even ask for Harder's consent, rather, he told

8

Harder that he was going to pat him down. Harder did not have an opportunity to consent to Officer Jacobs. When Officer Carswell asked Harder if he could check to see if Harder had anything on him, Harder remained silent. Or, as the trial court put it, Harder "did not disagree or refuse consent." Silence is not consent, as "[c]onsent by implication . . . is contrary to established law." *State v. Poulton*, 37 Kan. App. 2d 299, 307, 152 P.3d 678 (2007), *aff'd in part, rev'd in part* 286 Kan. 1, 179 P.3d 1145 (2008).

Moreover, the trial court's finding that Harder "did not disagree or refuse consent" does not imply that Harder consented to the search. This form of reasoning is unacceptable because of the difficulty in sustaining a factual proposition merely by negative evidence. Some have described this as the "Fallacy of Drawing an Affirmative Conclusion from a Negative Premise." See Copi and Cohen, Introduction to Logic, p. 239 (12th ed. 2005).

In addition, it is questionable whether Harder's consent was freely given. In determining whether consent is freely given, "[t]he appropriate inquiry . . . is whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." *State v. Spagnola*, 295 Kan. 1098, 1107, 289 P.3d 69 (2012). Our Supreme Court has developed a nonexclusive list of objective factors to determine whether an encounter with police is voluntary, and it has applied the factors in determining whether consent for a search is voluntary. 295 Kan. at 1108; *State v. Thompson*, 284 Kan. 763, 811-12, 166 P.3d 1015 (2007). These factors include the presence of multiple police officers, the display of an officer's weapon, physical contact by the police officer, and display of emergency lights. *Spagnola*, 295 Kan. at 1108; *Thompson*, 284 Kan. at 811. The officer's statements, such as "the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" and "use of a commanding tone of voice" are also considered. *Spagnola*, 295 Kan. at 1108; *Thompson*, 284 Kan. at 811. "[T]he prolonged retention of a person's

9

personal effects such as identification" can also suggest that consent is coerced. 284 Kan. at 811.

Many factors indicating involuntary consent were present in this case. Two officers were present, both armed, with active emergency lights. In a portion of the video, Officer Carswell's car lights can be seen and Officer Jacobs states that he had had his car lights on. As soon as Officer Jacobs left his patrol car, he commanded Harder to keep his hands visible and not to reach into his pockets. Instead of asking for Harder's consent for a search, Officer Jacobs told him that he was going to perform a search. Officer Jacobs' statement made it clear that he intended to search Harder whether or not Harder consented. Additionally, Officer Jacobs had Harder's identification card when Officer Carswell performed his search. A reasonable person would not have felt free to terminate an encounter with a police officer in this situation.

The video contradicts the trial court's conclusions that Harder consented to each officer's request to search. While Harder did not vocally object to the search, he did not specifically and unequivocally consent to being searched. Given the coercive environment of the search and the officers' treatment of Harder, any consent made would not have been given freely.

The trial court held that there were two bases for the officers' search of Harder: a *Terry* frisk and a consent. Nevertheless, the evidence does not support the trial court's legal conclusions on these bases. Because the trial court should have granted Harder's motion to suppress, we reverse Harper's convictions and remand with directions to suppress the evidence gathered in the unlawful search.

Convictions reversed and remanded with directions.