NOT DESIGNATED FOR PUBLICATION

No. 117,802

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS W. METCALF,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK, JR., judge. Opinion filed November 9, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GREEN and MALONE, JJ.

PER CURIAM: Police performed a warrantless search of Nicholas Metcalf's hotel room after investigating a noise complaint. During the search, police found a container later determined to have contained marijuana. Moreover, the police found a pipe. Police arrested Metcalf and charged him with domestic battery, possession of marijuana, and possession of paraphernalia. Before trial, Metcalf moved to suppress all evidence resulting from the warrantless search of the room. The trial court denied the motion. It held that the consent exception and the probable cause plus exigent circumstances exception to the search warrant requirement allowed the warrantless search of his hotel

room. Metcalf agreed to a bench trial on stipulated facts. The court convicted him of domestic battery, possession of marijuana, and possession of drug paraphernalia. On appeal, Metcalf argues that neither the consent exception nor the probable cause plus exigent circumstances exception permitted the warrantless search of his hotel room. For reasons stated later, we reverse Metcalf's convictions for possession of marijuana and for possession of drug paraphernalia. Nevertheless, we affirm his domestic battery conviction. Accordingly, we affirm in part, reverse in part, and remand with directions to suppress the drug possession and the drug paraphernalia evidence.

Prairie Band Casino received a noise complaint about one of the rooms in the casino's hotel. When casino security responded to the room, Nicole Rice answered the door. The security officer saw marks on Rice's neck. Casino security then called the tribal police. Officers Derek Wamego and Tyler Shobney responded. The officers met with casino security chief Albert Woods when they first arrived at the hotel. Woods told the officers about the noise complaint and the marks on Rice's neck. Woods also told the officers that Metcalf and Rice were the registered occupants of the room.

The officers went up to Metcalf's hotel room. Officer Wamego activated his body camera. Officer Shobney knocked on the hotel room door, stating: "Tribal police, open the door." After several rounds of knocking, Rice opened the door. Officer Shobney placed one arm on the door frame and one arm against the door, propping it open. He leaned into the room, stating: "Hello, thank you, where is Nick?" Officer Shobney then told Rice that "[w]e'd like to speak to him. Where is he? Can you go get him?" Rice, who had been standing in the suite's foyer, then walked toward the suite's living area calling "Nick." Officer Shobney fully crossed the suite's threshold and followed Rice through the foyer into the living area. Officer Wamego followed Officer Shobney into the suite.

Officer Shobney called "Nick!" and Rice also called out for Metcalf. Officer Shobney turned on the lights in the living area. Rice turned on the lights in the bedroom.

Officer Shobney asked, "Where's he at?" Rice, who was searching the bedroom alone, responded, "I don't know, he was right in here." Officer Wamego searched the living area and the balcony for Nick. Officer Shobney then asked Rice, "[I]s there any weapons or anything in here?" Rice responded, "[N]o." Officer Wamego searched the suite's bathroom. Officer Shobney searched the bedroom and found Metcalf crouched under a desk in his underwear.

Officer Shobney ordered Metcalf to get out from under the desk while both officers pointed their tasers at Metcalf. Officer Shobney ordered Metcalf to stand and face away from the officers. Metcalf asked if he could go to the bathroom first, and Officer Shobney said no. Officer Shobney handcuffed Metcalf while Rice asked why he was being arrested.

Once Metcalf was in handcuffs, Officer Shobney began questioning him saying, "[n]ow, you know why we're here, something you obviously did wrong." Metcalf responded, "[Y]ou're wrong." Metcalf claimed that he and Rice had simply been having sex, and they were not doing anything wrong. Officer Shobney stated that Metcalf had impeded their investigation by hiding under the table and refusing to come to the door. Officer Shobney told Metcalf that this constituted interference with a law enforcement officer and that Metcalf could go to jail for it. Officer Shobney then proceeded to question Metcalf about his account of the evening. Officer Wamego went back to the living area to question Rice.

Officer Wamego questioned Rice about her account of the evening. While questioning Rice, Officer Wamego asked her if she would be more comfortable speaking in the hallway. The living area where Officer Wamego questioned Rice is connected to the bedroom where Officer Shobney questioned Metcalf. The doorway between the living area and the bedroom remained open the entire time the officers were in the suite, and the

3

individuals in both rooms could clearly hear what was happening in the other room. Rice declined to move into the hall.

Rice told Officer Wamego that she and Metcalf were in a three-year relationship and used to live together but did not anymore. Rice stated that she and Metcalf had a disagreement that evening that resulted in a soda being spilled. She stated that at one point, she walked away from Metcalf and he grabbed her by her left shoulder area to turn her around and keep her near him. She admitted that he probably grabbed her neck at the same time. Rice continually asserted that "nothing happened" beyond that. She also maintained that Metcalf "didn't mean" to hurt her. Officer Wamego inspected Rice's neck multiple times. After questioning Rice for about 10 minutes, Officer Wamego went into the bedroom.

Officer Wamego questioned Metcalf about the evening based on Wamego's conversation with Rice about her account of the evening. Metcalf maintained that the noise complaint stemmed from loud sex, not the couple's disagreement. He also stated that the marks on Rice's neck were not caused by him grabbing her during their disagreement. Officer Wamego explained that Rice had told him that the couple had not had sex at all that evening.

Officer Shobney began picking up articles of clothing from the bedroom. He went through the pockets of a pair of pants. He put the pants on Metcalf. Officer Shobney then went to pick up a sweater from a chair in the bedroom. Metcalf directed Officer Shobney away from the chair, telling the officer his shirt was near the television stand and pointing the officer to the television stand. Officer Shobney shuffled through items near the television stand for a few seconds and then went back to the chair. Shobney asked Metcalf, as he pulled a gray hooded sweatshirt from the chair, "[W]hose shirt is this?" Metcalf responded,  "I don't know." Officer Shobney then picked up the sweatshirt and

4

carried it toward the living area, calling, "Hey Nicole." As Officer Shobney carried the sweatshirt past Metcalf, Metcalf stated that the sweatshirt was his.

Shobney placed the sweatshirt on the bed, pulled a shirt out of the sweatshirt, and went through the sweatshirt's pocket. Officer Shobney then went back over to the chair where he had found the sweatshirt. He picked up a container from the floor. Officer Shobney held up the container and stated, "That's what fell out of that pocket." Metcalf said, "[I]t's empty, isn't it?" Officer Shobney responded that it was not. Officer Shobney next picked up a pipe from the chair, stating, "[A]nd this is whose pipe?" Metcalf responded, "[T]he fuck?" Officer Shobney said, "[O]h, let's not play that . . . it's not my first rodeo." Officer Shobney asked, "[D]o you know whose pipe this is? It fell out of your pocket." Metcalf responded that he found it earlier in the parking lot. Officer Shobney stated that he did not believe him and that he could tell that Metcalf was high.

The State charged Metcalf with aggravated battery and possession of drug paraphernalia. After the pipe and container tested positive for THC, the State amended its complaint against Metcalf to include three charges: (1) severity level 5 possession of marijuana, (2) aggravated battery, and (3) possession of drug paraphernalia. The State later amended the second charge to domestic battery instead of aggravated battery.

Metcalf moved to suppress the physical evidence found and statements made during the search of the hotel room. Metcalf argued that the search of the hotel room was per se unreasonable because it was warrantless. Moreover, Metcalf argued that none of the warrantless search exceptions applied. The State opposed the motion, arguing that the probable cause with exigent circumstances exception applied. The trial court held a suppression hearing where Officer Shobney testified and the judge also watched the bodycam footage. The judge denied Metcalf's motion to suppress, finding that both the consent exception and the probable cause with exigent circumstances exception allowed the warrantless search of the hotel room.

5

After the trial court denied Metcalf's motion to suppress, the parties agreed to a nonjury trial on stipulated facts. The trial court found Metcalf guilty of possession of marijuana, domestic battery, and possession of drug paraphernalia. The trial court sentenced Metcalf to 18 months of probation with an underlying prison term of 28 months. The trial court also ordered Metcalf to have no contact with Rice. Metcalf timely appealed.

*Does the Consent Exception to the Search Warrant Requirement Apply to the Warrantless Search of Metcalf's Hotel Room?*

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures; Kansas courts interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection. *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). This protection applies to hotel and motel rooms. *State v. Chiles*, 226 Kan. 140, 146, 595 P.2d 1130 (1979). Warrantless searches are per se unreasonable unless they fall under one of the recognized exceptions to the warrant requirement. *Neighbors*, 299 Kan. at 239. Evidence obtained by a warrantless search may not be admitted into evidence unless the search falls under one of the recognized exceptions. See *State v. Hadley*, 55 Kan. App. 2d 141, 149, 410 P.3d 140 (2017) (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 [1961]).

When this court considers suppression issues on appeal, it reviews the factual underpinnings of the lower court's suppression ruling for "substantial competent evidence." *State v. Karson*, 297 Kan. 634, 639, 304 P.3d 317 (2013). Substantial competent evidence is "evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Wilkins v. State*, 286 Kan. 971, 980, 190 P.3d 957 (2008). On suppression issues, appellate courts review the trial court's legal conclusions de novo. *Karson*, 297 Kan. at

6

639. The State bears the burden to justify a warrantless search. *Neighbors*, 299 Kan. at 240.

Here, the parties do not dispute that the police entered and searched Metcalf's hotel room without a warrant. When Metcalf moved to suppress evidence resulting from the search, the trial court ruled that the warrantless search was valid under two separate exceptions to the warrant requirement. First, the trial court ruled that the consent exception to the warrant requirement applied.

"Valid consent to a search requires both (1) clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the absence of duress or coercion." *State v. James*, 301 Kan. 898, Syl. ¶ 4, 349 P.3d 457 (2015). Police may obtain consent to search either from the property's owner or, "in certain instances, from a third party who possesses either actual authority or apparent authority to consent to the search." *United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007). The existence of consent to a search is a question of fact determined from the totality of the circumstances. *State v. Ryce*, 303 Kan. 899, 932, 368 P.3d 342 (2016) (*Ryce I*), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017) (*Ryce II*). When there are no disputed facts, appellate courts review suppression issues as a matter of law, where the standard of review is de novo. *Karson*, 297 Kan. at 639. The State bears the "burden of establishing the scope and voluntariness of the consent to search." *State v. Boggess*, 308 Kan. 821, 827, 425 P.3d 324 (2018).

Metcalf argues that Rice did not give "unequivocal and specific consent to search." Here, Metcalf disputes the facts offered by Officer Shobney in his testimony for the State. In a mixed question of fact and law, we apply the bifurcated standard of review. It is worth repeating our standard of review.

7

First, we review the factual underpinnings of the trial court's suppression ruling for "substantial competent evidence." As stated earlier, substantial competent evidence is "'evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. . . . [S]ubstantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.' [Citation omitted.]" *State v. Gray*, 270 Kan. 793, 796, 18 P.3d 962 (2001). When reviewing for substantial competent evidence, however, this court may not "reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts." *Boggess*, 308 Kan. at 825. After reviewing the factual underpinnings for substantial competent evidence, this court reviews the court's ultimate legal conclusion de novo. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007).

> *The trial court's factual findings for concluding that the consent exception to the*
> *search warrant requirement applied.*

The trial court held a hearing on Metcalf's motion to suppress. The trial court admitted the bodycam video as evidence and heard testimony from Officer Shobney. After the hearing, the trial court ruled that Rice's conduct after she opened the door "amounted to consent given 'voluntarily, intelligently, and knowingly, and proved by a preponderance of the evidence.'" As a result, the trial court denied Metcalf's motion to suppress. The court wrote that Rice opened the door and that "[h]er actions afterward seemed to be an attempt to preserve 'plausible deniability' while allowing officers to enter the room and find the defendant." The court further wrote that Rice "did not invite the officers in or deny them entrance. Rather she stepped away from the door in such a way as to suggest the officers could enter. She then went to find the defendant, but told officers in a voice loud enough for all to hear that she did not know where he was anymore."

8

The trial court cited four separate factual actions by Rice in support of its ruling that Rice consented to the search: (1) Rice did not invite the officers in or deny them entrance; (2) Rice stepped away from the door in such a way as to suggest the officers could enter; (3) Rice went to find Metcalf; and (4) Rice told the officers loudly that she did not know where Metcalf was.

First, both Officer Shobney's testimony and the video footage showed that Rice neither invited the officers into the hotel room nor denied them entrance into the hotel room. For example, the video footage never shows Rice telling the officers they could come in or telling them they could not enter the hotel room. Officer Shobney testified that when he allegedly asked Rice if the officers could come in, she did not respond.

Second, Rice did go to find Metcalf. Officer Shobney testified that Rice went to the bedroom area and shrugged to indicate that she could not find Metcalf. The video footage contradicts his account of her search, as discussed below. The video does, however, show Rice left the front doorway to pass through the foyer into the rest of the suite to search for Metcalf. She did so after Officer Shobney asked: "[C]an you go get [Metcalf]?" Officer Shobney then followed directly behind her as she went into the room.

Third, Rice told the officers she could not find Metcalf. Officer Shobney testified that when Rice allegedly went to the bedroom area, she "kind of just put her arms up and was like, 'I can't find him.'" It is unclear from this if he meant she orally said, "I can't find him" or that she implied that "I can't find him" through her shrug. As discussed below, this encounter as recounted by Officer Shobney is factually impossible unless Officer Shobney was already in the room. The video footage does, however, show that Rice stated, "I don't know, he was right in here" when she was in the bedroom, approximately 30 seconds after both officers had already entered into the hotel room.

9

The record lacks support that Rice "stepped away from the door in such a way as to suggest the officers could enter." The video does not show Rice "stepping aside" at all. When the video first shows Rice, she is already standing to the right of the door, in the threshold of a bathroom immediately right of the suite's front door that Shobney is holding open. Officer Shobney testified at the suppression hearing that when Rice answered the door, he asked her where Metcalf was, and she said she could not find him.

The State asked Officer Shobney if he did anything to find Metcalf. Officer Shobney testified that "[w]e asked where he was at, and she kind of went off—it was a suite, so there was two rooms . . . and a bathroom, and she kind of went off towards the bedroom area and kind of—if I remember correctly, she kind of just put her arms up and was like, 'I can't find him.'"

The State then asked Officer Shobney:  So at that point, was the door still open and you were kind of at the threshold area at that point?" Officer Shobney answered, "[T]hat is correct." The State questioned Officer Shobney about Rice's emotional state, and then asked, "[w]hen the female—you said she kind of just turned around and shrugged like 'I can't find him.' When she did that, what were your next actions?" Officer Shobney replied, "I asked her if we could enter the room." The State asked Officer Shobney what was Rice's response? He testified that "[s]he kind of—she didn't really answer. She just did the same thing, just, like, looked around kind of like that. She didn't really answer."

The State then asked,  "So at that time did you enter the room?" Officer Shobney replied, "We did enter the room."

Officer Shobney's testimony directly contradicts the body camera footage. For example, Officer Shobney testified that before he asked Rice if the officers could enter the room, Rice "went off towards the bedroom" and "put her arms up and was like, 'I can't

find him.'" The footage does not show Rice "going off" towards anywhere until Officer Shobney has fully crossed the threshold into the hotel room and is following Rice.

In fact, for Officer Shobney to know Rice "went off towards the bedroom," he would have had to be well within the hotel suite. The bedroom is not accessible from the foyer where the front door is located; the bedroom is not even visible from the front door. The front door leads into a foyer that has three doors: one to a bathroom where Rice stood, one to an adjoining suite that was closed and locked from both sides, and one to the living area. To get to the bedroom from the front door, one must go through the foyer, to the door to the living area, then right about 4 yards through the living area, and through the bedroom door which is off of the living area. To see the bedroom door and bedroom area, one must be at least at the door to the living area. To be at the door to the living area, one must have fully entered the hotel suite and crossed through the foyer.

Officer Shobney himself admitted on direct examination that the bedroom is only accessible through a door off of the living area. The State asked, "So then do you have to go through a separate hallway or doorway or something to get into the bedroom area?" Officer Shobney answered, "That is correct." If Officer Shobney saw Rice go towards the bedroom and then saw her shrug, he had to be inside the hotel room. Nevertheless, Officer Shobney testified that the front door was still open and he was still at the threshold when he saw Rice allegedly go towards the bedroom area and shrug. This testimony contradicts itself. Thus, both of Officer Shobney's statements cannot be true.

Officer Shobney also testified that after Rice went to the bedroom and shrugged, he asked her if the officers could enter the hotel room. The bodycam footage shows that Officer Shobney did not ask Rice if he could enter the room. While the footage did not always clearly capture Rice's responses, it clearly captured all of Shobney's questions and commands to Rice when he spoke to her.

11

The following encompasses the entire exchange between Rice and the officers between the time Rice opened the door and the officers walked through the hotel suite's door.

> (0:40) Officer Shobney: "Tribal police, open the door."
>
> (0:42) [Rice opens the door.]
>
> (0:43) Officer Shobney: "Hello, thank you, where is Nick?
>
> Rice: [Inaudible].
>
> (0:47) Officer Shobney: "We'd like to speak with him. Where is he? Can you go get him?"
>
> Rice: [Inaudible].
>
> (0:53) [Rice begins walking from bathroom doorway through suite foyer to the living area doorway.]
>
> (0:53) Officer Shobney: [fully passes through the threshold of the door, follows Rice through the foyer to door to the living area] "Huh?"
>
> (0:56) Rice: "Nick!"
>
> (0:59) Officer Shobney: "Hey Nick."
>
> (1:00) [Officer Wamego has fully entered the suite, as is apparent by his reflection in the bathroom mirror].

At no point did Officer Shobney ask Rice for consent to enter the hotel room. Nonetheless, Officer Shobney testified that after he allegedly asked Rice for consent, she "looked around" and "didn't really answer" and then the officers entered the room.

The video does not show Rice stepping away from the front door at all until Officer Shobney asked her, "[C]an you go get [Metcalf]." Officer Shobney did not testify that Rice "stepped aside," but rather that she "went off" toward the bedroom, which is physically impossible for him to have seen unless he was already in the hotel room. Officer Shobney's testimony about when and how Rice left the doorway contradicts the video footage and is factually impossible in light of the layout of the hotel room as shown in the video footage. Accordingly, neither the footage nor Officer Shobney's testimony

12

show that Rice "stepped away [from the door] in such a way as to suggest the officers could enter." Thus, this factual finding does not support the trial court's legal conclusion that Rice consented to the search of the hotel room.

The three remaining factual underpinnings of the court's legal conclusion that Rice consented are as follows: (1) Rice did not invite the officers in or deny them entrance; (2) Rice then went to find Metcalf; and (3) Rice told the officers loudly that she did not know where Metcalf was.

Officer Shobney testified that he asked Rice if they could enter the hotel room. Officer Shobney further testified that Rice "didn't really answer." Thus, Rice remained silent. Or, as the trial court found, Rice "did not invite the officers in or deny them entrance." Silence is not consent, as "[c]onsent by implication . . . is contrary to established law." *State v. Poulton*, 37 Kan. App. 2d 299, 307, 152 P.3d 678 (2007), *aff'd in part and rev'd in part on other grounds* 286 Kan. 1, 179 P.3d 1145 (2008).

Moreover, from the trial court's finding that Rice did not invite the officers in or deny them entry into the hotel room, one cannot affirm or validly assume that Rice consented to the officers entry into the hotel room. This inference may not be drawn here because of the difficulty in sustaining a factual proposition based on negative evidence. This is an example of what logicians describe as the "Fallacy of Drawing an Affirmative Conclusion from a Negative Premise." See Copi, Introduction to Logic, p. 239 (12th ed. 2005).

Finally, the bodycam footage contradicts Officer Shobney's testimony that he asked Rice if the officers could enter the hotel room. The bodycam footage shows that at no point did Officer Shobney ask Rice for consent to enter the hotel room.

13

Moreover, the remaining two factual underpinnings of the trial court do not logically support its legal conclusion that Rice consented to the search of the hotel room which will be addressed below.

*Consent—legal conclusions*

Metcalf argues that Rice did not consent to the search of the hotel room because "mere acquiescence or submission to a show of lawful authority is inadequate to demonstrate voluntary consent." *State v. Cox*, 51 Kan. App. 2d 596, 601, 352 P.3d 580 (2015) (citing *State v. Jones*, 279 Kan. 71, 78, 106 P.3d 1 [2005]). Metcalf cites *Poulton*, 37 Kan. App. 2d 299, which was also cited with approval in *Cox*, 51 Kan. App. 2d at 601-02.

In *Poulton*, police went to the defendant's home looking for a woman who had violated her parole. The defendant spoke to the officers at the door and offered to get the woman from inside the house. The police officers followed the defendant into the house even though he never expressly consented to their entry into the house. After entering the house, the officers found evidence of other crimes. The trial court denied the defendant's motion to suppress the evidence the officers found inside the house. The trial court ruled that the defendant impliedly consented to the search because he did not stop the officers from following him inside. This court reversed on appeal, finding that "'[c]onsent by implication . . . is contrary to established law.'" *Cox*, 51 Kan. App. 2d at 602 (quoting *Poulton*).

The State cites an 11th Circuit court decision holding that "yielding the right-of-way" constituted consent for officers to enter the defendant's home. *United States v. Ramirez-Chilel,* 289 F.3d 744, 752 (11th Cir. 2002). *Ramirez-Chilel* differs from the case at hand because there the officers explicitly asked the defendant for consent to enter.

14

They also read and explained an implied consent form once they were in the home. In its decision, the 11th Circuit court differentiated *Ramirez-Chilel* from *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996), wherein the same court held that "'it is inappropriate to "sanction[] entry into the home based upon inferred consent."'" 289 F.3d at 752.

In *Gonzalez,* the court held that when police followed the defendant's mother into the home when she went to get a drink of water, the mother's actions were not adequate implied consent to the police's warrantless entry to the house. See *Ramirez-Chilel,* 289 F.3d at 752. In *Ramirez-Chilel,* the 11th Circuit court explicitly compared the two cases and wrote: "We can certainly make a distinction between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to the offices at the person's front door." 289 F.3d at 752.

Here, Officers Shobney and Wamego's actions better match those of the police in *Gonzalez*. The bodycam footage shows that the officers followed Rice into the suite after she followed their directive to go search for Metcalf. Furthermore, as discussed earlier, the trial court lacked substantial evidence for its finding that Rice "stepped away from the door in such a way as to suggest the officers could enter." The bodycam footage does not show Rice stepping away from the door at all until Officer Shobney told her to go find Metcalf. The account Officer Shobney provided, alleging he watched Rice step away from the door to look for Metcalf, is a factual impossibility and contradicts the bodycam footage.

The record shows that the officers did not ask Rice to allow them into the room; rather, Officer Shobney asked Rice to go look for Metcalf and the officers followed her. This is more analogous to the facts in *Gonzalez,* where the police followed a defendant's mother into the house when she went inside to get water, than it is to the facts in

15

*Ramirez-Chilel*, where police explicitly asked the defendant for permission to enter, and he responded by yielding the right-of-way into the home.

Kansas caselaw, as in *Poulton* and *Cox*, expressly disfavors implied consent for warrantless entry by police. A 2014 article, "Pardon Me, May I?" published in the Journal of the Kansas Bar Association, summarizes the state of the law on consent searches in Kansas. It states:

> "Consent may be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer, at least in federal courts. In our state courts consent by implication, at least when it involves homes and DUI blood testing, is not voluntary consent. Kansas state courts want something more." Wood, *Pardon Me, May I? Consent Searches in Kansas*, 83 J.K.B.A. 24, 27 (April 2014).

The article cites *Poulton* as its example of Kansas law disfavoring implied consent to searches of homes. It cites *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007), as an example of a federal case permitting implied consent. The court in *Guerrero* wrote that "a defendant's consent must be clear, but it need not be verbal." 472 F.3d at 789. Unlike the case at hand, the defendant in *Guerrero* explicitly testified that his nonverbal gesture was intended to signal consent to search of his car. Guerrero's challenge rested primarily on his allegations that his consent was not voluntary. Metcalf here does not argue that Rice involuntarily consented, rather he argues Rice did not consent to the search at all.

In summary, the video shows that Rice went to find Metcalf at the direction of Officer Shobney and that the officers followed directly behind her as she left the doorway. Rice did not loudly say she did not know where Metcalf was until 30 seconds after the officers had followed her into the hotel suite. The facts at hand—that Rice did not invite in or deny entry to the officers, then complied with their request to find Metcalf, and then later, while searching, said that she could not find Metcalf—do not

establish that Rice gave "unequivocal, specific" consent. See *James*, 301 Kan. 898, Syl. ¶ 4. Thus, substantial competent evidence does not support the trial court's legal conclusion that Rice consented to the search of the hotel room.

*Does the Probable Cause Plus Exigent Circumstances Requirement Apply to the Warrantless Search of Metcalf's Hotel Room?*

The trial court ruled that, in addition to the consent exception, the police's search of Metcalf's hotel room fell under the probable cause plus exigent circumstances exception to the search warrant requirement. The trial court held that based on the noise complaint, the marks on Rice's neck, and the fact that hotel staff told police they were looking for a "Nick," the officers had probable cause that a domestic battery had occurred in Metcalf's room. The court then held that under *State v. Gilbert,* 24 Kan. App. 2d 159, 942 P.2d 660 (1997), exigent circumstances also existed because there was "concern that a serious violent crime had occurred involving strangulation" and "every reason to believe that the defendant was present in the room." On appeal, Metcalf argues that the State lacked probable cause and that no exigent circumstances existed during the search of his hotel room.

"A warrantless search is permissible where there is probable cause for the search *and* exigent circumstances justify an immediate search." *State v. Ibarra*, 282 Kan. 530, 536, 147 P.3d 842 (2006) (citing *State v. Boyd,* 275 Kan. 271, Syl. ¶ 3, 64 P.3d 419 [2003]). If there is no probable cause, the existence of exigent circumstances is irrelevant. *Ibarra*, 282 Kan. at 544. The State has the burden to prove the lawfulness of the search and seizure. 282 Kan. at 533. On appeal, this court reviews the trial court's factual findings underlying its suppression decision for substantial competent evidence. *State v. Howard*, 305 Kan. 984, 988-89, 389 P.3d 1280 (2017). It then reviews de novo the ultimate legal conclusion drawn from those factual findings. 305 Kan. at 989. It does not reweigh the evidence or reassess witness credibility. 305 Kan. at 989.

17

The State must therefore show that the officers had probable cause to search the hotel room and that exigent circumstances existed when the search occurred. Officers have probable cause to search if they have a "reasonable belief that there is a fair probability that the place to be searched contains contraband or evidence of a crime. *Hadley*, 55 Kan. App. 2d at 149-50. The existence of exigent circumstances is a fact-specific determination, but courts generally recognize four categories of exigent circumstances. *State v. Dugan*, 47 Kan. App. 2d 582, 589, 591-92, 276 P.3d 819 (2012). The four categories include the following:  (1) preventing harm to law enforcement or the public; (2) preventing imminent loss of evidence; (3) hot pursuit; and (4) preventing escape of a suspect. 47 Kan. App. 2d at 592.

*Probable cause—substantial competent evidence*

Officers have probable cause to search if they have a "reasonable belief that there is a fair probability that the place to be searched contains contraband or evidence of a crime. *Hadley*, 55 Kan. App. 2d at 149-50. "When determining whether probable cause exists, an appellate court considers the totality of the circumstances, including all of the information in the officer's possession, fair inferences therefrom, and any other relevant facts, even if they may not be admissible on the issue of guilt." 55 Kan. App. 2d at 150. The trial court here ruled that the officers had probable cause to search the hotel room because of the noise complaint, the marks on Rice's neck, and the fact that hotel staff told police they were looking for a "Nick."

The State argues that the officers had probable cause to search the hotel room on the basis of the noise complaint and the report that Rice had marks consistent with strangulation on her neck when she answered the door for security. Further, the State argues that the officers had a reasonable belief that Metcalf was in the room because Rice

18

admitted Metcalf was in the room and hotel staff told the officers that Metcalf had rented the room.

Metcalf argues that, of the noise complaint, the marks, and the fact that Metcalf was a registered guest of the room, only the noise complaint is supported by substantial competent evidence. First, Metcalf claims that there is not substantial competent evidence to support the trial court's finding that the officers had a reasonable belief that Rice had marks on her neck consistent with strangulation. This argument fails.

Officer Shobney testified that hotel security told him that Rice had marks on her neck when she answered the door earlier in the night. On cross-examination, Officer Shobney testified that the hotel security manager must have told him the marks were consistent with strangulation, or "something along them [*sic*] lines." While Metcalf attempted to cast doubt on the credibility of the fact that the marks were "consistent with strangulation," the trial court clearly credited Officer Shobney's testimony on this issue, and no other evidence in the record contradicts it. Accordingly, the trial court's finding that the marks on Rice's neck was a basis for probable cause is supported by substantial competent evidence.

Second, Metcalf argues that the State provided no evidence connecting Metcalf to the marks on Rice's neck. Metcalf argues: "To have probable cause that a battery occurred requires some level of evidence that someone caused a battery, not just that someone has an injury." Metcalf quotes *State v. Abbott*, 277 Kan. 161, Syl. ¶ 2, 83 P.3d 794 (2004), arguing that "[p]robable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime." *Abbott*, however, refers to the probable cause necessary for a warrantless arrest, not the probable cause necessary for a warrantless search. Probable cause necessary for a warrantless search requires only "the reasonable belief that there is a fair probability that the place to be searched contains contraband or evidence of a crime." *Hadley*, 55 Kan. App. 2d at 149-

19

50. Whether the police could connect Metcalf to the marks on Rice's neck is thus irrelevant to whether the police had probable cause to search the hotel room.

*Probable cause—legal conclusions*

In his brief, Metcalf cited to the probable cause standard for a warrantless arrest. He has not, however, challenged the lawfulness of the arrest or the lawfulness of his detention during the execution of the search; rather, he challenges only the lawfulness of the search. To search the hotel room as the officers did here, the officers needed only a reasonable belief that a crime had occurred and that the room contained evidence of the crime. 55 Kan. App. 2d at 149-50.

Whether the police had a reasonable basis to believe Metcalf committed the battery is not relevant to whether there was probable cause to conduct a warrantless search of the hotel room where Rice was found with the injury. "[P]robable cause to search is not interchangeable with probable cause to arrest." *State v. Beltran*, 48 Kan. App. 2d 857, 865, 300 P.3d 92 (2013); see also *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 n.6, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978) ("'[W]hile probable cause for arrest requires information justifying a reasonable belief that a crime has been committed and that a particular person committed it, a search warrant may be issued on a complaint which does not identify any particular person as the likely offender.'") (quoting LaFave, Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth," U. Ill. Law Forum 255, 260-61 [1966]).

While the officers did specifically ask Rice where Metcalf was, Metcalf did not address the scope of the warrantless search at the trial court level or on appeal. He has not argued that the officers conducted a warrantless search *for him* and not merely a search of the hotel room for evidence of domestic battery. Accordingly, because Metcalf

20

challenges only the search of the hotel room, the State need establish only that the officers had probable cause to search the hotel room.

Here, the State has established that the officers had probable cause to suspect that a battery or domestic battery occurred in the hotel room on the basis of the noise complaint and the marks on Rice's neck. Because Rice was staying in the hotel room and answered the door at the hotel room with the marks on her neck, the police had "reasonable belief that there is a fair probability to believe" that evidence of the battery would be in the hotel room. See *Hadley*, 55 Kan. App. 2d at 149-50. Accordingly, the officers had probable cause to search the hotel room for evidence relating to the possible domestic battery of Rice.

*Exigent circumstances*

Here, the trial court correctly ruled that a reported domestic battery does not per se create exigent circumstances. The trial court then applied *Gilbert* to conclude that exigent circumstances existed here. In *Gilbert*, this court concluded that probable cause and exigent circumstances justified a police officer's warrantless search of a trailer. *Gilbert*, 24 Kan. App. 2d at 168. There, a neighbor called police to tell them that Randolph Gilbert had hit her and his wife when she was at the couple's trailer. Police went to the trailer and observed broken bottles and an overturned dumpster in the driveway and saw that one of the trailer's windows was broken. Poppy Gilbert came to the front door of the trailer; she was visibly upset and had recently been crying. She told police, "'[h]e's not here, he's not here.'" She also told police, "'[y]ou're not coming in here,'" but police moved Poppy aside and entered anyway. 24 Kan. App. 2d at 160-61.

At the suppression hearing, the police officer testified that based on Poppy's demeanor "'it was obvious that a domestic violence had taken place.'" 24 Kan. App. 2d at 161. The police officer testified he believed Poppy's behavior indicated she was hiding

21

Randolph in the trailer and that he believed further violence might occur if he left the trailer without making sure the potential for violence had ended. This court held that the police officer's warrantless search of the trailer was justified. 24 Kan. App. 2d at 168.

The trial court here ruled that exigent circumstances existed because "there was concern that a serious violent crime had occurred involving strangulation," there were strong reasons to believe Metcalf was in the room, and the officers peacefully entered the room.

Courts generally recognize four nonexclusive categories of exigent circumstances: "(1) preventing harm to police or the public by capturing a dangerous suspect; (2) securing evidence in the face of imminent loss or destruction; (3) hot pursuit of a fleeing suspect; and (4) thwarting escape of a suspect. [Citations omitted.]" *Dugan*, 47 Kan. App. 2d at 592. Metcalf encourages this court to apply the *Platten* factors to determine whether exigent circumstances existed at the time of the warrantless search. The *Platten* factors are nonexclusive, but include:

> "'(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) strong reasons to believe that the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended and (6) the peaceful circumstances of the entry.'" *State v. Rupnick*, 280 Kan. 720, 728, 125 P.3d 541 (2005) (quoting *State v. Platten*, 225 Kan. 764, 770, 594 P.2d 201 [1979]).

The *Platten* court also included "'the possible loss or destruction of evidence'" as a factor. See *Rupnick*, 280 Kan. at 728 (citing *Platten*, 225 Kan. at 770).

The State disagrees with Metcalf's categorical approach and urges in its brief that this court consider "the totality of the circumstances to determine whether officers face an emergency." The State further argues in its brief that "there was an objective exigency

22

here because of the potential for violence present when a victim has visible strangulation marks in a domestic situation." The State also argues in its brief that exigent circumstances existed permitting the officers to "enter the hotel room to determine if Rice remained in danger. A person presenting with life-threatening marks undeniably establishes a potentially life-threatening situation. And it should be unquestionable that domestic violence has the potential for escalation. . . . [T]he officers needed to ensure Rice's safety by ensuring her attacker was secured."

The State is correct that exigent circumstances cannot be determined mechanically. Instead, "the sufficiency of exigent circumstances to excuse the warrant requirement depends upon the totality of the relevant facts in a given case." *Dugan*, 47 Kan. App. 2d at 589 (citing *Kentucky v. King*, 563 U.S. 452, 463, 131 S. Ct. 1849, 179 L. Ed. 2d 865 [2011]). While the four categories and the *Platten* factors are helpful analytical tools, the State carries the burden here to show that the search was lawful.

Both the State and the trial court noted that the violent nature of the suspected offense weighed in favor of a finding of exigent circumstances. The State cites to a 1989 Arizona Supreme Court case, *State v. Greene*, 162 Ariz. 431, 433, 784 P.2d 257 (1989), to argue that exigent circumstances existed here. There, the Arizona Supreme Court held that a domestic violence call to the police "creates a sufficient indication that an exigency exists allowing [an] officer to enter a dwelling if no circumstance indicates that entry is unnecessary." 162 Ariz. at 433. *Greene* remains good law in Arizona. Indeed, many studies consistently establish that domestic violence poses a high risk for lethality both for victims and responding officers. A woman is more likely to die in an attack where her partner strangles her than in a domestic violence attack where a partner uses other types of violence. Attempted strangulation, even if unsuccessful, is "a significant predictor for future lethal violence." Glass, et al., *Non-Fatal Strangulation Is an Important Risk Factor for Homicide of Women*, 35 J. Emergency Med. 329, 333 (October 2008). Nonetheless, under Kansas law, domestic battery is a misdemeanor, not a felony, for an offender's first

23

two arrests in five years. See K.S.A. 2017 Supp. 21-5414(c)(1). Further, in Kansas, "[a] report of domestic violence does not per se establish exigent circumstances justifying a warrantless entry into a private residence." *Gilbert*, 24 Kan. App. 2d 159, Syl. ¶ 3.

In its argument, the State emphasizes concern for Rice's safety and the violent nature of the suspected crime. Nevertheless, the officers' actions at the scene were largely contrary to this alleged concern. When Rice answered the door, the officers did not ask her if she was okay or if she needed help. Instead, all Officer Shobney did was ask her where Metcalf was and ask her to get Metcalf. The officers then followed her into the hotel suite, allowing her to go several yards ahead of them and even into the dark bedroom by herself, well ahead of them.

The hotel suite was dark when Rice retreated into the suite to find Metcalf at Officer Shobney's command. Officer Shobney turned on the lights in the foyer when he followed her through the foyer. Rice rounded the corner from the lighted foyer to the dark living area at 0:56 of the video footage. The officers remained in the lighted foyer. Officer Shobney shined a flashlight into the living area from the foyer but did not enter the living area until 1:07 of the video. He turned on the living area lights at 1:15. At this point, Rice had already entered and exited the dark bedroom alone. When Officer Wamego rounded the corner so that Rice is visible in the video at 1:10, she was in the bedroom. It is unclear how long she was in the bedroom because she was out of the view of the body camera. She walked out of the bedroom briefly (1:13-1:16) and then reentered, flipped on some bedroom lights (1:21), and walked around the bedroom saying things like "I don't know, this is fucking crazy." Officer Shobney approached the bedroom door and stood outside the room at 1:20 but did not actually enter the bedroom until 1:35 of the video. The officers allowed Rice to be in the dark living room by herself for 10 seconds; they allowed her to enter the dark bedroom by herself and remain in the room for nearly 30 seconds.

24

At no point in the search for Metcalf did the officers caution Rice or ask her to wait behind them or in the hallway. Instead, they allowed her to enter dark, closed-off rooms by herself while they remained several yards behind her. They delayed turning on lights in the living area and, in fact, allowed Rice to cross to the far side of the bedroom, unaccompanied, to turn on the bedroom lights herself while the officers remained in the foyer and living area. These actions are not consistent with alleged concern for injury to Rice at the hands of the as-yet unlocated Metcalf, who the officers believed was still in the room. The officers' actions, allowing Rice to search the dark suite alone, yards ahead of them, provided ample opportunities for Metcalf to injure Rice while the officers were in the room. In fact, the officers did not ask Rice if she would be more comfortable out in the hallway, as opposed to being in the suite, until after the police had already found and handcuffed Metcalf. Thus, the State's claim that "risk for harm to the victim" created exigent circumstances here rings hollow.

Concern for officer safety also does not weigh in favor of a finding of exigent circumstances here. The officers did not ask Rice if there were any weapons in the suite until well into their search for Metcalf, after Rice had already entered and searched dark rooms by herself. This placed Rice and the officers at risk as they entered into a dark suite where a suspect was hiding without even first asking if the suspect was armed.

Finally, concern about the suspect's escape or destruction of evidence also does not weigh in favor of a finding of exigent circumstances. The suite in question was on the third floor, meaning the balcony did not create a likely escape route. The suite's front door was thus the only likely means of escape. Police could have easily waited at the door to ensure Metcalf did not leave the suite without their knowledge while they sought a search warrant. The State offered no arguments about potential destruction of evidence at the trial court level or on appeal. Indeed, the officers had Rice, who was arguably herself the best evidence of the alleged domestic battery, available to them at the front door as soon as they knocked. The officers did not take available steps to "preserve" what

evidence she may have provided. For example, they could have had her step outside into the hallway as soon as she answered the door, but they did not do so.

In sum, the officers' conduct at the scene belied the State's later claim of "exigent circumstances." The State's argument and the trial court's ruling focused on the potential for injury to Rice, but the officers failed to take basic measures to ensure Rice's safety. Instead, they placed her in danger by asking her to search the dark rooms for Metcalf. The trial court's reasoning that "there was concern that a serious violent crime had occurred involving strangulation" and "the officers entered peacefully" does not resolve these glaring discrepancies. The totality of the circumstances here weighs against a conclusion that exigent circumstances existed. Because this court reviews the trial court's legal conclusions de novo, we reverse the trial court and hold that while the police had probable cause to search, they lacked the exigent circumstances necessary to justify a warrantless search of the hotel room.

Because Metcalf conceded during oral argument his domestic battery conviction was proper, we affirm that conviction.

Affirmed in part, reversed in part, and remanded with directions.