NOT DESIGNATED FOR PUBLICATION

No. 118,174

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY TRAMANE MILLER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Opinion filed March 22, 2019. Affirmed in part, vacated in part, and remanded with directions.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., LEBEN, J., and KEVIN BERENS, District Judge, assigned.

PER CURIAM: Anthony Tramane Miller appeals his conviction of aggravated indecent liberties with a child and the district court's assessment of costs at sentencing. Miller raises two arguments on appeal. Miller first contends the district court erred by ordering him to pay excessive costs for laboratory fees. Second, Miller argues the State committed prosecutorial error which prejudiced his right to a fair trial. While we find the State committed prosecutorial error, the error was harmless and we affirm Miller's conviction. We also agree with Miller that the lab fees imposed were excessive, and we vacate those fees and remand for a nunc pro tunc order assessing the correct amount.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On April 9, 2015, police arrived at T.G.'s residence in response to T.G.'s request to speak with an officer. Sergeant Clayton Hill found T.G., a 15-year-old female, and her mother arguing about where T.G. had been throughout the day. Hill separated the two and spoke to T.G. privately. While speaking with T.G., Hill noticed that she appeared intoxicated. Hill smelled alcohol on T.G.'s breath, she became increasingly incoherent, her eyes were bloodshot, and she began losing her balance.

When questioned, T.G. told Hill that she drank an entire bottle of RumChata and one beer. T.G. said Miller gave her the alcohol while she was at his house. Hill then asked whether any unwanted sexual activity occurred at Miller's house, and T.G. responded that nothing sexual happened. Hill administered a preliminary breath test, which showed that T.G. had a .166 blood-alcohol level. Hill called for an ambulance after he observed T.G. look like she was almost passed out.

In 2015, Miller was 42 years old. T.G. had been introduced to Miller through Ashley Cunningham, T.G.'s former babysitter and a family friend who T.G. considered like a sister to her. Cunningham and Miller had a child together, and T.G. would babysit their child.

After T.G. was treated at the hospital for alcohol poisoning, Cunningham drove her from the hospital. During this car ride, T.G. told Cunningham that Miller had raped her. This disclosure was reported to the police, who interviewed T.G. T.G. told Detective Dave Bunger that Miller provided her with alcohol and forced her to drink the RumChata. After T.G. drank the RumChata, Miller grabbed her wrist and forced her into a bedroom. Once inside the bedroom, Miller placed T.G. on the bed, removed her pants and underwear, lowered his pants, and engaged in sexual intercourse. T.G. described Miller's actions as rape.

After her interview, T.G. went to the hospital to undergo a sexual assault examination. During the sexual assault exam, the nurse observed a substance in T.G.'s vagina consistent with semen. The nurse collected swabs from T.G.'s cervix and vaginal walls, and these samples were taken to the Kansas Bureau of Investigation (KBI) for testing.

Bunger also interviewed Miller, who claimed he was never alone with T.G., denied giving her any alcohol, and said there was no sexual activity between them. Miller voluntarily provided DNA samples to the police.

The State charged Miller with alternative counts of rape when the victim was incapable of giving consent and aggravated indecent liberties with a child. The State also charged Miller with furnishing alcohol to a minor with the intent to induce that minor to participate in a sex crime.

At trial, T.G. testified about the events that happened on April 9, 2015. In the morning, Miller either called or texted T.G. and asked if she wanted to attend a barbecue at his house. During T.G.'s direct examination, the State asked about Miller's invitation and engaged in the following discussion:

> "[THE PROSECUTOR:]  So he texted you. At that initial time when he asked you over to the barbecue, does he mention to you that anyone else is going to be there?
> "[T.G.:]  I don't think so.
> "[THE PROSECUTOR:]  At some point did you guys text about a man named Nathan Pinney?
> "[T.G.:]  About who?
> "[THE PROSECUTOR:]  A man named Nathan Pinney?
> "[T.G.:]  Sometime we did.

"[THE PROSECUTOR:]  Okay. What was that general conversation with you and the defendant about Mr. Pinney? What was it that the defendant was talking to you about with Mr. Pinney?

"[T.G.:]  I don't remember.

"[THE PROSECUTOR:]  Do you ever recall the defendant seeing if you wanted to begin a relationship with Mr. Pinney or talking to you about whether or not you wanted to be in a relationship?

"[DEFENSE COUNSEL:]  Objection, leading.

"THE COURT:  Overruled.

"[T.G.:]  With Mr. Pinney? Not that I can remember."

T.G.'s mother allowed T.G. and her brother to go to the barbecue. After T.G. arrived at Miller's house, Miller introduced T.G. to his friend Nathan Pinney, who was around 26 or 27 years old. T.G. did not know Pinney's age but assumed he was over 18 years old. She thought Pinney seemed like a cool person and was cute. However, T.G. had no interest in having sex with Pinney. During the barbecue, T.G. and Miller talked about Pinney, but T.G did not remember the point of the conversation or what was discussed.

After the barbecue ended, T.G.'s brother left Miller's house and T.G. stayed. Miller gave T.G. a beer and a large bottle of RumChata and told T.G. to drink the full bottle of RumChata. After T.G. began drinking the alcohol, Miller, Pinney, and T.G. went into Miller's bedroom. The three sat on the bed; Miller sat on T.G.'s left side and Pinney sat on her right side. All of T.G.'s clothes were on when she first sat on the bed.

The next thing T.G. remembered was Miller and Pinney putting her on top of Pinney. She did not think her pants were on and could not recall if she was still wearing underwear. But if her pants and underwear were removed, someone else had removed them. Pinney began trying to put his penis inside T.G.'s vagina. This hurt T.G. and, at some point, Pinney stopped trying.

4

After T.G. got off Pinney, she was placed with her back on the bed. Miller got on top of T.G.—chest to chest—and pulled down his pants and underwear. Miller put his penis "[a]ll the way inside" of T.G.'s vagina and had sex with her for about 30 minutes. Miller did not use a condom.

T.G. did not want to have sexual intercourse with Miller. T.G. did not feel coherent while Miller was having sex with her and believed she was too drunk to consent. T.G. did not think she could have stopped Miller from having sex with her because Miller was bigger than her, she was scared, and she did not know what to do. After Miller was finished, he took T.G. home. T.G. called the police when she got home and remembered the police coming to her house.

Jessica Albers performed the sexual assault examination on T.G. about 2 a.m. on the night Miller had intercourse with T.G. Albers testified about her observations during the examination. T.G. told Albers that Miller had raped her. During the examination, Albers saw a laceration and a substance near T.G.'s cervix that appeared consistent with semen. Albers believed that T.G. recently had sexual activity.

A KBI forensic scientist testified about the DNA test results from the swabs collected from T.G. during the sexual assault examination. Seminal fluid was identified on the swabs from T.G.'s vagina, and the DNA from the swabs was consistent with Miller's DNA.

Miller testified in his own defense. Miller said he never texted T.G. about coming over to a barbecue at his house. Instead, T.G. and her brother came over to give Miller a phone that he bought from T.G.'s mom. Miller invited T.G. and her brother to stay for a while after T.G.'s brother wanted to play a video game on Miller's game system. At some point, T.G.'s mother called and asked Miller to bring T.G. home, which he did.

Miller claimed he never provided alcohol to T.G. and did not have sexual intercourse with T.G.

The jury found Miller guilty of aggravated indecent liberties with a child. The jury deadlocked on the alternative rape charge and the furnishing alcohol to a minor charge. The district court sentenced Miller to 107 months in prison and ordered him to pay $800 in KBI lab fees.

Miller timely appeals.

I.    DID THE DISTRICT COURT ERR BY ORDERING MILLER TO PAY $800 IN KBI LAB FEES?

Miller first contends the district court's order imposing $800 in costs for KBI lab fees was excessive under K.S.A. 2017 Supp. 28-176(a). Miller argues the district court was statutorily authorized to impose only a $400 lab fee and requests that we reverse and remand for the imposition of a $400 KBI laboratory fee. The State concedes that only a $400 KBI lab fee should have been imposed.

Resolving this issue involves interpreting K.S.A. 2017 Supp. 28-176. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

As a preliminary matter, Miller did not object to the amount of KBI fees assessed against him during sentencing. Issues not raised before the district court typically may not be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). That said, we may reach an issue on appeal despite a failure to raise it below when the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case. See *In re Estate of Broderick*, 286 Kan.

6

1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009). Because Miller's theory is a question of law on proven facts and determines the case, we consider this issue on its merits.

K.S.A. 2017 Supp. 28-176(a)(1) provides that a district court must order "any person convicted . . . of a misdemeanor or felony . . . to pay a separate court cost of $400 for *every individual offense* if forensic science or laboratory services . . . are provided, in connection with the investigation, by . . . [the KBI]." (Emphasis added.)

In a multicount criminal case, the district court may order the defendant to pay a KBI lab fee "for each count on which he or she was convicted and for which forensic science or laboratory services were rendered or administered." *State v. Goeller*, 276 Kan. 578, Syl. ¶ 5, 77 P.3d 1272 (2003), *overruled on other grounds by State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015). The phrase "every individual offense" as used in K.S.A. 2017 Supp. 28-176(a) refers to each count on which the defendant is actually convicted. See 276 Kan. at 584; *State v. Hubbard*, No. 111,666, 2016 WL 562996, at *15 (Kan. App. 2016) (unpublished opinion). Therefore, the district court may impose a $400 KBI lab fee on only a crime of conviction.

In this case, the jury convicted Miller of only one offense—one count of aggravated indecent liberties with a child. As a result, the district court was only authorized to impose a $400 KBI lab fee under K.S.A. 2017 Supp. 28-176(a). We vacate the district court's assessment of the $800 KBI lab fee and remand to the district court for a nunc pro tunc order to be entered that reflects the reduced amount.

II.     DID THE STATE COMMIT REVERSIBLE PROSECUTORIAL ERROR?

Miller next contends the State committed prosecutorial error during closing argument by arguing facts not in evidence and mischaracterizing T.G.'s testimony.

Miller asserts this prosecutorial error prejudiced his right to a fair trial. Although Miller did not object to the prosecutor's comments at trial, a contemporaneous objection is not required for review of prosecutorial error claims based on comments made during closing argument. See *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015).

To evaluate claims of prosecutorial error, appellate courts use a two-step process: first determine whether any error occurred and, if so, determine whether there was prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In determining whether prosecutorial error occurred, this court "must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109.

"In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence." *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000). That wide latitude given to prosecutors in discussing the evidence during closing arguments "'includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle.'" *State v. Chandler*, 307 Kan. 657, 688, 414 P.3d 713 (2018) (quoting *State v. Carr*, 300 Kan. 1, 250, 331 P.3d 544 [2014], *rev'd and remanded on other grounds by* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 [2016]). While a prosecutor may create arguments that include reasonable inferences drawn from the evidence, a prosecutor may not comment on facts outside the evidence during closing argument. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). When a prosecutor argues facts that are not in evidence or misstates witness testimony, the first prong of the prosecutorial error test is met. See *State v. Sturgis*, 307 Kan. 565, 570, 412 P.3d 997 (2018); *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011).

If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

> "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

A.      *Prosecutor's Comments During Closing Argument*

The prosecutor began the State's closing argument by stating, "A 42-year-old man, invited a 15-year-old girl to his house under the auspice of a barbecue." The prosecutor continued:

> "[T.G.] told you exactly what it was that he really invited her over for. 'Meet my buddy, meet Nathan. He would really like to hang out with you.' 25 years old. 25-year-old would really like to hang out with a 15-year-old. But the defendant, he doesn't kick it or mess around with anyone under the age [of 21]. Oh no, never, that wouldn't happen. 'But why don't you guys come over for a barbecue.'"

The prosecutor next discussed what occurred when T.G. went into Miller's bedroom with Miller and Pinney.

> "Sitting on the bed after having drunk an entire bottle of Rum Chata and a beer. What do they do? They pass her around. First it's Nathan. He was interested in her, he thinks she's real cute. 'Come over, meet my boy. You will love him.' But he thinks he's too big. He can't fit.

"So he gives her to the defendant. That was the phrase she used. 'So he gave me to the defendant.'"

B.    *The State Committed Prosecutorial Error*

Miller first asserts that no evidence supported the prosecutor's argument that Miller enticed T.G. to come to his home by telling her that Pinney wanted to meet her. Miller claims the implication of this argument was that he "planned to have T.G. come to his house for the purpose of Mr. Pinney or himself to have sex with her, but he disguised it under the 'auspice' of an innocent barbecue invitation." Miller also argues that T.G. never said the phrase, "So [Pinney] gave me to the defendant," which the prosecutor attributed to her.

During trial, T.G. never testified that Miller invited her over to meet Pinney. T.G. also did not testify that Miller said Pinney was interested in her. Instead, T.G. did not think that Miller mentioned anyone else being at his house when he invited her over to the barbecue. Although T.G. recalled texting about Pinney at sometime with Miller, she could not remember what was discussed. And T.G. specifically said she did not remember ever discussing a relationship with Pinney. The prosecutor's suggestion that Miller invited T.G. over to his house by asking her to meet Pinney is unsupported by the evidence.

Similarly, contrary to the prosecutor's suggestion, T.G. never used the phrase "[s]o he gave me to the defendant" to describe when Pinney stopped trying to have sex with her and Miller began to do so. Instead, after Pinney stopped and said he could not fit, T.G. testified, "That's when [Miller] starts doing his stuff." As a result, the State also committed prosecutorial error when it claimed T.G. used the phrase, "So he gave me to the defendant."

10

Since the State committed prosecutorial error, we must determine whether this error is harmless.

### C.      *The Prosecutorial Error is Harmless*

When analyzing whether error is harmless, we must consider "any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.,* shown that there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 111. While the strength of the evidence against the defendant may have a secondary impact on the harmless error analysis, the focus of the inquiry is the impact of the error on the verdict. 305 Kan. at 111.

Miller argues the prosecutorial error here advanced the narrative that he was a sexual predator who lured T.G. to his house for his friend to take advantage of T.G. sexually and that he would take over if his friend did not. But, contrary to Miller's claims, there is no reasonable possibility that the prosecutor's error contributed to the verdict.

The jury instructions in this case provided that the statements and remarks of counsel are not evidence. The district court also instructed the jury to disregard any statements by counsel that were unsupported by the evidence. We generally presume that jurors follow the instructions they receive from the district court. *State v. Mattox*, 305 Kan. 1015, Syl. ¶ 2, 390 P.3d 514 (2017). And before closing argument began, the district court explained, "As you heard in these instructions, closing arguments are not evidence. They are the attorney's opportunity to try to convince you what they believe the evidence has shown."

11

Moreover, the jury found Miller guilty on only the charge of aggravated indecent liberties with a child in violation of K.S.A. 2014 Supp. 21-5506(b)(1), which is defined as "[s]exual intercourse with a child who is 14 or more years of age but less than 16 years of age." Neither premeditation nor lack of consent are elements of the crime. The reason for Miller's invitation or any belief by the jury that Miller engaged in predatory behavior with the goal of sexual intercourse with T.G. was irrelevant to the jury's verdict of guilt.

Last, there was overwhelming evidence that Miller had sexual intercourse with T.G.—a 15-year-old child. T.G. testified that she was 15 years old when Miller had sexual intercourse with her. The nurse who performed the sexual assault examination observed a substance in T.G.'s vagina consistent with semen and believed that T.G. recently had sexual activity. Finally, DNA evidence demonstrated that Miller's semen was in T.G.'s vagina after she left his house.

The State has shown that there is no reasonable possibility that the error contributed to the verdict. Accordingly, the prosecutorial error is harmless and does not require reversal of Miller's conviction. We affirm Miller's conviction.

Affirmed in part, vacated in part, and remanded with directions.